# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DANIEL ANTHONY PEACE,

Plaintiff,

v.                                    **Case No. 15-cv-262-pp**

WARDEN TIMOTHY DOUMA, LUCAS WOGERNSE,
WARDEN MEISNER, MICHAEL A. DITTMANN, J. CORLISS,
LINDA FAIT, CAPTAIN ASHWORTH, T. ZIEGLER, R. SCOTT,
CAPTAIN D. MORGAN, D. HAUTAMAKI, SANDY HAUTAMAKI,
CO II G. JOHNSON, CO SCHLAEFER, CO VIRES, SGT. HINICIKLE,
SGT. FREND, CAPTAIN BOODRY, DONALD STRAHOTA,
TONIA MOON, and JANE DOE, Security Director's Secretary,

Defendants.

---

**DECISION AND ORDER ALLOWING PLAINTIFF TO PROCEED *IN FORMA PAUPERIS*, DENYING AS MOOT THE PLAINTIFF'S MOTION FOR USE OF PRISON RELEASE ACCOUNT TO PAY PARTIAL FILING FEE (DKT. NO. 8), SCREENING THE PLAINTIFF'S COMPAINT, DENYING AS MOOT PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 3), DENYING AS MOOT THE PLAINTIFF'S MOTION *IN LIMINE* (DKT. NO. 14), AND DISMISSING CASE**

---

The plaintiff, a state prisoner, filed this 24-page *pro se* complaint under 42 U.S.C. §1983, alleging that twenty-one defendants violated his civil rights. Dkt. No. 1. The case comes before the court on the plaintiff's motion to appoint counsel, the plaintiff's motion for use of prisoner release account to pay initial partial filing fee, and the plaintiff's motion *in limine*, as well as for a determination regarding whether the plaintiff may proceed *in forma pauperis* and for screening of the plaintiff's complaint.

1

## I.   *IN FORMA PAUPERIS* STATUS

The Prison Litigation Reform Act applies to this action because the plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915.[1] That law allows a court to give an incarcerated plaintiff the ability to proceed with his lawsuit without pre-paying the civil case-filing fee, as long as he meets certain conditions. One of those conditions is a requirement that the plaintiff pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. *Id.*

On March 12, 2015, the court issued an order requiring the plaintiff to pay an initial partial filing fee of $7.79. Dkt. No. 7. The court received the initial partial filing fee of $7.79 on March 26, 2015. The following day, the court received from the plaintiff a motion asking the court to issue an order authorizing the prison to pay his initial partial filing fee from his prison release account. Dkt. No. 8. The court will deny as moot the plaintiff's motion to use his prison release account to pay the initial partial filing fee. Dkt. No. 8. The court will allow the plaintiff to proceed *in forma pauperis*, and will allow the plaintiff to pay the balance of the $350.00 filing fee over time from his prisoner account, as described at the end of this order.

---

[1] The court notes that in this case, the plaintiff did not file an application asking the court to allow him to proceed *in forma pauperis*. Since November 2014, however, this same plaintiff has filed seven (7) civil suits, and in most of them, he has asked to proceed *in forma pauperis*. Given that, the court simply proceeded in this case under the assumption that the plaintiff wanted the court to allow him to proceed *in forma pauperis*.

Case 2:15-cv-00262-PP   Filed 02/29/16   Page 2 of 28   Document 16

The court notes that the plaintiff has accumulated three strikes under 28 U.S.C. §1915(g). They include: (1) Peace v. Strahota, No. 14-CV-1608 (E.D. Wis., Pepper, J) (complaint dismissed on June 22, 2015 for failure to state a claim); (2) Peace v. Quinn, No. 14-CV-1590 (E.D. Wis., Pepper, J.) (complaint dismissed on September 24, 2015 for failure to state a claim); and (3) Peace v. Lewis, No. 15-CV-561 (E.D. Wis., Pepper, J.) (complaint dismissed on January 21, 2016 for failure to state a claim). These strikes do not preclude the plaintiff from proceeding *in forma pauperis* in this case, because he filed this complaint before he had accumulated any of the three strikes, but the plaintiff should be aware that the strikes will apply to any appeals or complaints he files after January 21, 2016.

## II.  SCREENING OF PLAINTIFF'S AMENDED COMPLAINT

### A.  Standard for Screening Complaints

The law requires the court to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss part or all of a complaint if the plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

A claim is legally frivolous when "it lacks an arguable basis either in law or in fact." Denton v. Hernandez, 504 U.S. 25, 31 (1992); Neitzke v. Williams, 490 U.S. 319, 325 (1989); Hutchinson ex rel. Baker v. Spink, 126 F.3d 895,

900 (7th Cir. 1997). The court may, therefore, dismiss a claim as frivolous where it is "based on an indisputably meritless legal theory" or where the "factual contentions are clearly baseless." Neitzke, 490 U.S. at 327. "Malicious," although sometimes treated as a synonym for "frivolous," "is more usefully construed as intended to harass." Lindell v. McCallum, 352 F.3d 1107, 1109-10 (7th Cir. 2003) (citations omitted).

To state a claim under the federal notice pleading system, the plaintiff must provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A plaintiff does not need to plead specific facts, and his statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). However, a complaint that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The complaint allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, courts follow the principles set forth in Twombly. First, they must "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. A plaintiff must support legal conclusions with factual allegations. Id. Second, if there are well-pleaded factual allegations, courts must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that the defendants: 1) deprived of a right secured by the Constitution or laws of the United States; and 2) acted under color of state law. Buchanan-Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). The court is obliged to give the plaintiff's *pro se* allegations, "however inartfully pleaded," a liberal construction. Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

B.    Facts Alleged in the Proposed Complaint

On October 28, 2012, defendants Johnson and Schlaefer wrote a conduct report for the plaintiff. Dkt. No. 1 at 7. They charged the plaintiff with unauthorized transfer of property, and with violations of institution policies and procedures, because another inmate was caught using the plaintiff's headphones. Dkt. No. 1-1 at 1. According to the conduct report, Schlaefer noticed that inmate Maggett had a set of headphones plugged into another

5

inmate's television. The report indicates that investigation uncovered that the headphones belonged to the plaintiff, and that the plaintiff "admitted giving Maggett his headphones." Id. While the complaint purported to be written in the first person by Schlaefer, COII Johnson signed it. Id.

While the complaint is not clear, it appears that defendant Boodry served the plaintiff with the conduct report. Dkt. No. 1 at 7. The plaintiff told Boodry that he was in the bathroom when the headphone incident happened, and that Johnson was not there. Id. Defendant Boodry asked for a minute and went to talk with defendant Hinicikle, who is the unit's sergeant. Id. When Boodry came back, he told the plaintiff he was going to give him a reprimand. Id.

After Boodry left, Johnson called the plaintiff back to the sergeant's station and said, "you got away this time, but we'll get you again." Id. The plaintiff waited for Johnson to leave the sergeant's station and then reported to Hinicikle that Johnson threatened him. Id. Hinicikle said, "you should take his comment with a grain of salt." Id.

Later that day, the plaintiff asked Johnson why he wrote the ticket for Schlaefer. Id. The plaintiff explained that he had come out of the bathroom, and that Schlaefer had told the plaintiff to give her his headphones. Id. Johnson responded, "I don't care where you were. Just tell us that Maggett stole your headphones. You said he had them, you didn't give them to him. The only thing you have to do is tell us Maggett stole them, and the ticket will go away." Id.

6

The plaintiff submitted an inmate complaint that night regarding Johnson's conduct. Id. The plaintiff received a response from the inmate complaint examiner (ICE) that said the plaintiff had to talk to the unit manager before he could send an inmate complaint. Id. The ICE said to submit a written response from the unit manager with the inmate complaint. Id.

Days later, the plaintiff asked defendant Vires if he could get a job in the bathroom. Id. Vires said, "the Sgt. said you can't get a job." Id. The plaintiff asked why and Vires said, "you probably got someone mad." Id. Every week, the plaintiff asked Vires if he could get a job, and Vires kept saying no. Id.

One day, the plaintiff went to Hinicikle and asked why he could not get a job, and Hinicikle said, "because of that conduct report you received." Id. The plaintiff decided to write the Security Director a letter on an inmate complaint form explaining his issues. Id. at 8. "A bit after" the plaintiff wrote the letter, Vires gave the plaintiff a job cleaning the showers part time. Id. Vires said, "I'm going to give you a chance to prove yourself." Id.

The next day, Schlaefer called the plaintiff to the officer's station after lunch and asked if Vires had said the plaintiff could work in the bathroom. Id. The plaintiff said, "Yes, why?" Id. Schlaefer told the plaintiff that the sergeant said he was not supposed to get a job. Id.

Schlaefer woke the plaintiff and told him that Johnson wanted him in the bathroom. Id. Johnson said that he wanted the plaintiff to fix the septic system. Id. After the plaintiff finished, he reported to Hinicikle, "Johnson is harassing me. He made me clean the septic system, he knows the person who

7

cleaned the toilets and urinals, suppose[d] to do that." Id. Hinicikle told the plaintiff that he gets paid to work in the bathroom and that Johnson can pick anyone who works in the bathroom. Id.

Ultimately, the plaintiff was moved to cleaning the dayroom. Id. As part of that assignment, Johnson instructed the plaintiff to clean up some urine on the floor. Id. The plaintiff told defendant Frend that Johnson was harassing him and making him do other people's jobs. Id. Frend said, "I don't care, get away from here." Id.

On February 11, 2013, the plaintiff complained of bugs (silverfish) in his locker, and an officer put in a work order for spray. Id. The defendant later cleaned out his locker, then fell asleep. That night, defendant Schlaefer woke the plaintiff up for a random bunk search. Id. at 8-9. Several days later, defendant Vires was joking around with another inmate and told the plaintiff that he was supposed to search his bunk. Id. at 9.

On February 16, 2013, Vires conducted a "so-called" random bunk search and brought all plaintiff's canteen to the sergeant's station. Id. at 9. The plaintiff was called to the interview room, where defendant Johnson questioned him about whether the plaintiff was selling canteen. Id. Johnson indicated that he was going to see about getting the plaintiff put in segregation. Id. Vires gave the plaintiff a conduct report for enterprises and fraud, unauthorized transfer of property, and lying regarding the large amounts of canteen found during the bunk search. Dkt. No. 1-1 at 2-3.

Then defendant Sandy Hautamaki called the plaintiff to her office and asked the plaintiff about the letter he sent to the Security Director. Dkt. No. 1 at 9. The plaintiff asked how she got the letter, and she said it was forwarded to her because there was not a Security Director at the time. Id. The plaintiff explained his problems with staff, and Hautamaki said she would talk to staff. Id. The plaintiff asked Hautamaki for a written response to file an inmate complaint. Id.

The plaintiff did not get a written response, and so on February 21, 2013, he wrote a letter to defendant Warden Douma, requesting protective custody. Dkt. No. 1, Ex. 3. Douma responded to the letter six days later. Dkt. No. 1-1 at 4-5. Douma denied the plaintiff's request because it did not meet the requirements outlined in the administrative code and noted that the plaintiff's "apparent inability to cooperate and get along with staff is not a consideration in this process." Id. at 7. Douma instructed the plaintiff to address unit related concerns with Hautamaki. Id.

Almost a month later, on March 22, 2013, Hautamaki was the hearing officer for the plaintiff's conduct report regarding his canteen. Dkt. No. 1 at 10. The plaintiff noticed her check some boxes on the conduct report as he entered the room. Id. She said, "according to policies, I can't find you guilty of Enterprises and Fraud." Id. The plaintiff showed Hautamaki all of his canteen receipts and explained everything that happened with the writing of the conduct report. Id. She returned some of the plaintiff's canteen. Id.

Before the plaintiff left, Hautamaki asked if there was anything going on in the unit that the officers did not know about. Id. He told her about a television, which he indicates "they" were looking for, and some shoes. Id. The plaintiff did not want her to tell the officers that he was the one who told her, and Hautamaki said, "I won't tell anyone. I will have them do a random bunk search." Id.

The next day, Vires asked the plaintiff how he beat the ticket. Id. The plaintiff responded that Hautamaki had said she couldn't find him guilty of the charges in the conduct report. Id. Vires told the plaintiff, "Johnson and Sgt. are really mad. I heard them talking to the Unit Manager, asking why she didn't find you guilty. I would watch my back if I was you." Id.

Around that time, the plaintiff was cleaning the day room and Johnson walked up and told the plaintiff that he had to clean the septic system. Id. The plaintiff responded that he did not work in the bathroom anymore and that his arm was messed up so he couldn't "turn that thing." Id. at 10-11. Johnson said, "do it or get a ticket." Id. at 11. The plaintiff tried to turn it, but he could not do it. Id. He went to his bunk and got his x-ray paperwork and took it to Johnson. Id.

After lunch, the plaintiff went to Hinicikle and reported that Johnson was still harassing him and making him clean the septic system even though he no longer worked in the bathroom. Id. Over the intercom, Hinicikle called the plaintiff to the interview room and asked "do you want to go to the hole? Because I'll send you to the hole right now, all I have to do is make one phone

10

call to the Unit Manager. The Unit Manager wants you in the hole. She said you lied about that TV." Id. He then said, "You have a lot of people mad at you, behind that canteen shit you pulled, if that guy finds out you tried to tell on him, what do you think he will do?" Id. The plaintiff did not say anything. Id. Hinicikle continued, "Then you are going to want an officer to help you, they will just turn the other way. You better start acting right around here or you'll end up in the hole. Let's say you leave, something happens you get lock back up and come here, how do you think officers will treat you?" Id.

The plaintiff responded that he wanted to be treated fairly, that he was not scared of Hinicikle, and that he wanted to know why he wouldn't give the plaintiff a better job. Id. Hinicikle said, "the way you been acting around here, I don't think anybody will give you a job. You think I should give you a better job, you keep it up your [sic] not going to have the job you got now, if (Sgt) Frend was working you would already be fired." Id. The plaintiff said that he had told the Unit Manager the truth, but she "just didn't follow directions." Id. at 12. The plaintiff told Hautamaki that the only way to prove it was by calling property, but Hinicikle had an officer do a bunk search that night and did not call property so they did not get the TV. Id.

Around that time, the plaintiff showed Schlaefer the conduct report that Johnson wrote for her and the conduct report that Johnson wrote for Vires. Id. Schlaefer said, "you know what, I thought it was wrong you got the first ticket, I said, all of you should get a ticket or none, they wanted your bunky, you got caught in the cross fire." Id.

11

Between March 27, 2013, and April 8, 2013, Vires and Schlaefer gave false statements to Hautamaki. Id. Hautamaki wrote a conduct report on April 8, 2013, for disrespect and lying, which correctional officer Boyle (who is not named as a defendant) served on April 9. Id. The plaintiff told Boyle that they would have found the TV if they had called property. Id. Boyle went and searched the bunk area and told inmates to bring their property receipts for their TVs to the desk. Id. He then called property, found the TV, and gave an inmate a conduct report. Id.

On April 9, 2013, the plaintiff sent an inmate request to Hautamaki, and she called the plaintiff to her office the next day. Id. at 12-13. The plaintiff told Hautamaki that Boyle had found the TV. Id. at 13. Hautamaki said, "don't try to minimize what you did, I will not be hearing your conduct report, you can tell it to Unit Manager Mr. Hautamaki." Id.

The plaintiff had a Program Review Committee (PRC) hearing in the morning on April 11, 2013. Id. The committee included defendants Fait, Ashworth, and Ziegler, and they made a decision to send the plaintiff to work release. Id.

That afternoon, defendant D. Hautamaki (Mr. Hautamaki) heard the plaintiff's conduct report. Id. He had already checked boxes on the paper when the plaintiff walked into the room. Id. Mr. Hautamaki read the conduct report out loud, then the phone rang. Id. He said "I'm doing that now" and hung up. Id. Mr. Hautamaki asked the plaintiff if he had something to say, and the plaintiff started to talk, but "he cut me off." Id. He said, "you shouldn't joke

with staff, when I see inmate joke with staff it always end[s] badly, I should send you to the hole, but I'm only going to give you 9 days bunk confinement." Id. The plaintiff asked when his bunk confinement would start, and Mr. Hautamaki said "after you leave this office." Id. The plaintiff left the office, gave his radio and TV to staff and put on a pair of orange pants. Id. The plaintiff actually received both bunk confinement and loss of electronics as his punishment for this conduct report. Id. at 14.

The plaintiff complains about the length of time it took defendants J. Corliss and Fait to update his inmate classification report after his conduct reports. Corliss added information regarding the plaintiff's March 22, 2013, conduct report disposition on April 9, 2013. Id. at 13; Dkt. No. 1-1 at 12. Fait added information regarding the plaintiff's April 11, 2013, conduct report disposition on May 3, 2013. Dkt. No. 1 at 14; Dkt. No. 1-1 at 12.

At some point after he finished his bunk confinement, the plaintiff asked Hinicikle if he could get a job. Id. at 14. The plaintiff explained that Boyle found the TV and said he would like a better job. Id. Hinicikle said he would give the plaintiff a better job, but gave him the runaround until July and then put the plaintiff on the lawn mowing crew. Id.

Between April 11, 2013, and October 2013, Johnson continued to harass the plaintiff. Id. Johnson would make comments to other correctional officers about the plaintiff's conduct report regarding canteen, saying he should have written the conduct report better, and laughing at the plaintiff. Id.

The plaintiff had another PRC hearing on August 7, 2013; the members of the PRC were defendants Fait, Mr. Hautamaki, Scott, and Morgan. Id. The plaintiff explained to the PRC that Johnson was writing conduct reports for other officers without being present at the events he described, that staff were playing games with jobs, and about defective conduct report hearings. Id. During the hearing, members of the committee mentioned the plaintiff's problems with staff and told the plaintiff he still had problems with personal responsibility. Id.

Finally, the plaintiff provides details regarding the inmate complaints he filed challenging his three conduct reports. Id. at 15-16. He also attached the relevant documents to his complaint. Id., Dkt. No. 1-1.

The plaintiff submits that the defendants' conduct constituted retaliation and deliberate indifference and violated his due process rights, and his rights under the First and Eighth Amendments, as well as negligence. Id. at 21-24. He also lists liability and personal involvement, but these are not causes of action. Id. The plaintiff seeks compensatory and punitive damages and community service by the defendants. Id. at 17-20. He also wants injunctive relief in the form of body cameras with recordings that are saved until the security warden reviews and clears them. Id. at 20.

C.    Legal Analysis of Alleged Facts

Due to the wide-ranging nature of the plaintiff's claims and the large number of defendants, the court will start by going through the defendants (sometimes in groups) and eliminating those against whom the plaintiff does

14

not state a claim. The court will then consider the plaintiff's claims against the remaining defendants.

As in other cases he has filed with this court, the plaintiff asserts that the defendants "were in complicity to retaliation on the petitioner." Dkt. No. 1 at 7. To the extent that the plaintiff is attempting to state a conspiracy claim, the intracorporate-conspiracy doctrine bars that claim because all of the defendants work for the same state agency—namely, the Wisconsin Department of Corrections. See Beese v. Todd, 35 Fed. Appx. 241, 243 (7th Cir. 2002); Payton v. Rush-Presbyterian, 184 F.3d 623, 632 (7th Cir. 1999).

1. Personal Involvement

The plaintiff named Warden Meisner as a defendant, but he is not mentioned in either the body of the complaint or the plaintiff's request for relief section (where he addresses each of the other named defendants individually and asks for a certain amount of money from each of them). The plaintiff has alleged no personal involvement by Warden Meisner, and the court will dismiss him as a defendant.

The same is true for defendant Michael Dittmann. The plaintiff's exhibits, however, reveal that Dittman approved the rejection of one of the plaintiff's inmate complaints, and so the court will address Dittman in the section of this order that relates to the treatment of the plaintiff's complaints.

The plaintiff also implies that Jane Doe, the Security Director's Secretary, violated the plaintiff's constitutional rights by forwarding a letter the plaintiff wrote to the vacant office of Security Director to the Unit Manager. The

plaintiff believes this is a violation because the complaints in the letter related to problems the plaintiff was having with Unit Staff. The court cannot determine whether such a position existed, whether there was a person filling that position, or whether, if there was a person in that position, that person forwarded (or refused to forward) the plaintiff's letter to an unoccupied office. The answers to those questions are irrelevant, however, because the plaintiff's letter ended up in the hands of Sandy Hautamaki, who addressed it. If such a person as Security Director Secretary (Jane Doe) existed, the plaintiff has not stated a claim against her.

###### 2.    Inmate Complaint Examiners

The plaintiff's claims against defendant Tonia Moon, Lucas Wogernese, and Donald Strahota (the one piece of documentation he submitted that mentioned Michael Dittmann) are limited to their involvement with his inmate complaints, which were filed in 2014, more than a year after the events underlying the plaintiff's claims. Dkt. No. 1 at 15-16. Despite the gap in time between the events the plaintiff describes and the dates upon which he finally filed his complaints, the plaintiff suggests that these defendants failed to act on the plaintiff's behalf when they could have. Id. at 19-20.

Section 1983 makes public employees liable "for their own misdeeds but not for anyone else's." Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir.2009). "Ruling against a prisoner on an administrative complaint does not cause or contribute to the [constitutional] violation." George v. Smith, 507 F.3d 605, 609-10 (7th Cir.2007).

16

A plaintiff could state a claim that a defendant involved in the inmate complaint process failed to properly do his or her job in that process, perhaps by shredding complaints without reading them and/or failing to investigate them entirely. See Burks, 555 F.3d at 595. The plaintiff does not allege such activity here. He disagrees with the outcome of the complaints and the decisions made regarding whether he had good cause for filing the complaints more than fourteen days after the underlying events, but the fact that a complaint examiner decides a complaint in a way that the inmate does not like does not state a constitutional violation. The court will dismiss Moon, Wogernese, Strahota, and Dittmann as defendants.

3.     Inmate Classification Reports

The plaintiff's claims again defendants J. Corliss and L. Fait relate to their updates to his inmate classification form. Inmates do not have a constitutional right to have prison personnel update classification forms, or to make those updates in any particular time period. Nor does the court find that the updates were particularly untimely. The plaintiff does not state a claim against these defendants. The court will dismiss Corliss as a defendant, and will dismiss this claim against L. Fait. Because Fait also was a member of one of the plaintiff's Program Review Committees, the court will address that claim when it discusses the plaintiff's similar claims against other committee members.

4.      Program Review Committee (PRC)

The plaintiff has sued each individual who was a member of the PRCs for his hearings on April 11, 2013 and August 7, 2013. The members of the PRC, however, function in a quasi-judicial role, and are entitled to absolute immunity.

"[J]udges are entitled to absolute immunity from damages for their judicial conduct" because "the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability." Snyder v. Nolen, 380 F.3d 279, 286 (7th Cir. 2004) (quotations and citations omitted). "Accordingly, the 'touchstone' for the doctrine's applicability has been the 'performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights.'" Id. (quoting Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36 (1993)).

> The Supreme Court has instructed that a functional approach should be taken in determining whether an individual is entitled to absolute immunity. Whether absolute immunity ought to be afforded is dependent upon the nature of the functions performed by the officer in question and the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions. The cloak of immunity is designed to prevent a situation in which decision-makers act with an excess of caution or otherwise … skew their decision in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct out of a fear of litigation or personal monetary liability.

Snyder, 380 F.3d at 286 (citations and quotations omitted).

"These policy concerns have required that, in some instances, '[t]he absolute immunity afforded to judges [be] extended to apply to quasi-judicial

18

conduct of [n]on-judicial officials whose official duties have an integral relationship with the judicial process.'" Snyder, 380 F.3d at 286 (quoting Richman v. Sheahan, 270 F.3d 430, 435 (7th Cir. 2001)).

During the PRC hearings, the members of the committee receive and evaluate evidence and make decisions regarding inmate security classifications and placement. These are quasi-judicial functions, and thus, members of the PRC are entitled to the same absolute immunity afforded judges. Accordingly, the court will dismiss the following defendants: Fait, Ashworth, Ziegler, R. Scott, and D. Morgan. The court also will dismiss the plaintiff's claims against Mr. D. Hautamaki with regard to his involvement in the plaintiff's August 7, 2013, PRC hearing. The court will address the plaintiff's other claims against D. Hautamaki below.

The court also notes that the due process clause of the Fourteenth Amendment was not applicable to the plaintiff's PRC hearings, because a prisoner does not have a protected liberty interest in his classification level or placement. Sandin v. Conner, 515 U.S. 472, 483-84 (1995); Lekas v. Briley, 405 F.3d 602, 609-10 (7th Cir. 2005) (quoting Meachum v. Fano, 427 U.S. 215, 225 (1976).

### 5. Processing of Conduct Reports

The plaintiff's only claim against defendant Boodry is that Boodry delivered to the plaintiff a conduct report with which the plaintiff did not agree. After the plaintiff told Boodry his side of the story, Boodry talked to Sergeant Hinicikle, and even according to the plaintiff's own version of events, Boodry

summarily disposed of the conduct report by giving the plaintiff a reprimand instead of requiring a conduct report hearing. If anything, Boodry helped the plaintiff. The court will dismiss him as a defendant.

Nor will the court allow the plaintiff to proceed on his claims against the two other defendants for their roles in his PRC hearings: S. Hautamaki and Mrs. D. Hautamaki. As the court stated above, the plaintiff was not entitled to Fourteenth Amendment due process at those hearings because the punishments the plaintiff suffered due to his disciplinary convictions (a reprimand, fourteen days' loss of canteen, and nine days of bunk confinement with no electronics) raised no due process concerns and implicated no protected liberty interest. See Sandin, 515 U.S. at 486.

The court will dismiss Mr. D. Hautamaki as a defendant. The court will consider the plaintiff's other claims against S. Hautamaki below.

6.      Prison Job and Cell Search

A number of the plaintiff's substantive claims relate to his attempts to obtain a prison job, his dissatisfaction with prison jobs he did obtain, and officers' reactions to his complaints about his prison job.  The plaintiff did not have a protected liberty interest in prison employment. Obriecht v. Raemisch, 545 Fed.Appx. 535, 539 (7th Cir. 2014); Hoskins v. Lenear, 395 F.3d 372, 374-75 (7th Cir. 2005); DeWalt v. Carter, 224 F.3d 607, 613 (7th Cir. 2000). As a result, he states no constitutional violations against anyone who refused to give him such a job, or gave him a job he didn't like, or was not sympathetic to his complaints about his job.

20

The only factual allegation the plaintiff makes regarding defendant Frend is that he said "I don't care" in response to the plaintiff's complaints about his job, and about what Johnson was making him do (clean the septic system). While Frend's words may not have been sympathetic, the plaintiff had no protected interest in his prison job, and Frend had no duty to make the job better for the plaintiff. The court will dismiss Frend as a defendant.

The court will not allow the plaintiff to proceed on claims against defendant Vires regarding his interactions with the plaintiff about a job. At first, Vires was simply passing on to the plaintiff the bad news that the plaintiff could not have a job. Dkt. No. 1 at 7. Then Vires actually gave the plaintiff a job, and "a chance to prove [himself]." Id. at 8. These actions do not state a constitutional claim.

Likewise, the plaintiff's claims regarding Vires conducting a "so-called" random bunk search do not state a constitutional claim. Id. at 9. A prisoner "does not have a reasonable expectation of privacy enabling him to invoke the protections of the Fourth Amendment." Hudson v. Palmer, 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The plaintiff may not proceed on a Fourth Amendment claim against Vires regarding searching his cell. The court will discuss the plaintiff's Eighth Amendment harassment claims against Vires and other below.

### 7. False Conduct Reports and Statements

"An inmate states a claim under §1983 if a guard knowingly prepares a false report that is the basis for sanctions against the inmate only if the inmate

was also denied his rights under <u>Wolff v. McDonnell</u>, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)." <u>Peck v. Davis</u>, 444 F.Supp.2d 941, 943 (N.D. Ind. 2006). "[A]n allegation that a prison guard planted false evidence which implicates an inmate in a disciplinary infraction fails to state a claim for which relief can be granted where the procedural due process protections as required in <u>Wolff v. McDonnell</u> are provided." <u>Id.</u> at 943-44 (quoting <u>Hanrahan v. Lane</u>, 747 F.2d 1137, 1141 (7th Cir. 1984). In this case, with regard to the various conduct reports at issue (authored by Johnson, Schlaefer, Vires and D. Hautamaki), the procedural due process protections under <u>Wolff</u> were not required, because again, the plaintiff had no liberty interest at stake.

The plaintiff may not state a claim against any of these defendants regarding false conduct reports or false statements

8.    Retaliation

The plaintiff suggests that Johnson and other defendants took retaliatory actions against him. To proceed on a retaliation claim, a plaintiff must allege that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the [d]efendants' decision to take the retaliatory action." <u>Bridges v. Gilbert</u>, 557 F.3d 541, 546 (7th Cir. 2009) (internal quotations omitted). The plaintiff suggests that the defendants retaliated against him, but he does not identify any specific activity he engaged in that was protected by the First Amendment,

22

or that such activity was a reason for the retaliation. The plaintiff has not stated a retaliation claim against any of the defendants.

### 9. Harassment

The plaintiff makes no claims that any of the defendants physically harmed him. The question, then, is whether the plaintiff has stated claim for verbal harassment. The plaintiff suggests that defendants Johnson, Schlaefer, Hinicikle, and Vires harassed and/or threatened him, and that defendants S. Hautamaki and Douma were aware of their actions and failed to take action to stop the harassment.

The Supreme Court has held that Eighth Amendment provides prisoners with a remedy for "calculated harassment unrelated to prison needs." Hudson v. Palmer, 468 U.S. at 530. The Court stated that, while the Fourth Amendment does not provide inmates with a privacy right, that does not "mean that prison attendants can ride roughshod over inmates' rights with impunity. The Eighth Amendment always stands as a protection against 'cruel and unusual punishments.'" Id.

The Seventh Circuit has said that "standing alone, simple verbal harassment does not constitute cruel and unusual punishment." DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000). However, "it is unclear what 'simple' is intended to connote." Beal v. Foster, 803 F.3d 356, 358 (7th Cir. 2015). "Simple or complex, most verbal harassment by jail or prison guards does not rise to the level of cruel and unusual punishment. But some does." Id. (citations omitted).

The court has held that "[t]hreats of grave violence can constitute cruel and unusual punishment under the Eighth Amendment." Hughes v. Farris, 809 F.3d 330, 334 (7th Cir. 2015) (citing Dobbey v. Ill. Dep't of Corr., 574 F.3d 443, 445 (7th Cir. 2009)). In Dobbey, the Seventh Circuit found that a threat "can rise to level of cruel and unusual punishment." 574 F.3d at 445. The court concluded, however, that a prison guard's alleged act of getting up in the middle of a card game to hang a noose in the sight of black prisoners, while other guards calmly continued the card game, could not reasonably be taken seriously as a threat (rather than as racial harassment), and did not rise to the level of cruel and unusual punishment, as required to support prisoner's §1983 claim against the prison officials. Id. The court affirmed the dismissal of the plaintiff's Eighth Amendment claim at screening. Id. at 447.

Recently, in Beal and Hughes, the Seventh Circuit has allowed the plaintiffs to proceed on verbal harassment claims under the Fourteenth Amendment. These cases involved "nearly identical allegations" that guards verbally abused inmates by using anti-gay slurs. Hughes, 809 F.3d at 334. In Beal, guards called "an inmate 'derisive terms' like 'punk, fag, sissy, and queer,' thereby 'increasing the likelihood of sexual assaults on him.'" Hughes, 809 F.3d at 334 (quoting Beal, 803 F.3d at 358). The court found that this kind of abuse constituted claims for violation of the plaintiffs' due process rights under the Fourteenth Amendment and equal protection claims under the Fourteenth Amendment Equal Protection Clause. Id.

In the current case, the plaintiff's allegations do not come close to the kind of harassment described in Hughes and Beal—not even close to the harassment described in Dobbey. The plaintiff does not allege that any of the defendants threatened him with grave violence. He does not allege that they used racial slurs, or abusive language related to his gender or sexual orientation. Rather, he asserts that they made him do things he didn't like, and said things that, for lack of a better phrase, offended his feelings.

For example, the plaintiff asserts that Johnson harassed him by making him clean the septic system and clean urine off the floor. Johnson also said, in reference to the conduct report, "you got away this time, but we'll get you again." Dkt. No. 1 at 7. The plaintiff alleges that Johnson made comments to other correctional officers about the plaintiff's conduct report regarding canteen, saying he should have written the conduct report better, and laughing at the plaintiff. Id. at 14.

The plaintiff claims that on one occasion, Hinicikle threatened to send the plaintiff to the hole, and said that the plaintiff had a lot of people mad at him. Id. at 11. Hinicikle asked the plaintiff, "if that guy finds out that you tried to tell on him, what do you think he will do?" Id. Hinicikle also said, "Then you are going to want an officer to help you, they will just turn the other way. You better start acting right around here or you'll end up in the hole. Let's say you leave, something happens you get lock back up and come here, how do you think officers will treat you?" Id. This was not a specific threat to the plaintiff but a vague allusion to what might happen if the plaintiff needed help from

25

guards he had alienated. It was a hypothetical posed to the plaintiff as advice regarding how to get along better in prison. Even if the court were to assume it was threatening, despite the context, this non-specific reference to something that could happen, spoken between Hinicikle and the plaintiff, does not rise to the level of harassment in the constitutional sense.

The plaintiff also does not state a claim against defendants Vires and Schlaefer, who allegedly made false statements to Hautamaki about things the plaintiff said. The conduct report Hautamaki drafted regarding those statements says that the plaintiff stated, "Maybe Johnson should learn how to write better tickets" and "[t]here should be more policies put on the ticket so you can find me guilty next time." Dkt. No. 1, Ex. 7. Even if the plaintiff did not say these things, the fact that Vires and Schaefler relayed them to Hautamaki did not constitute cruel and unusual punishment.

The plaintiff does not suggest that Hautamaki or Douma verbally harassed or threatened him, just that they failed to intervene to stop the course of treatment. There was no actionable harassment to stop, so any failure of Hautamaki or Douma to stop the other defendants was not cruel and unusual punishment.

The plaintiff does not state claims of constitutional harassment against any of the defendants. Indeed, he states no constitutional claims at all against any of the defendants in this case, and the court will dismiss his complaint.

### III.  PLAINTIFF'S OTHER MOTIONS

Because the court is dismissing the plaintiff's complaint, the plaintiff's motion to appoint counsel (Dkt. No. 3) and his motion *in limine* (Dkt. No. 14) are moot.

### IV.  CONCLUSION

The court hereby **ORDERS** that the plaintiff may proceed *in forma pauperis*. The court **DENIES AS MOOT** the plaintiff's motion for use of his prison release account to pay his initial partial filing fee (Dkt. No. 14). The court **ORDERS** the Secretary of the Wisconsin Department of Corrections or his designee to collect from the plaintiff's prison trust account the $342.21 balance of the filing fee by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The Secretary or his designee shall clearly identify all payments by the case name and number assigned.

The court **DISMISSES** this case for failure to state a claim, pursuant to 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1). The court orders the clerk of court to enter judgment accordingly. The court also instructs the clerk of court to document that this inmate has brought an action that was dismissed for failure to state a claim under 28 U.S.C. §§1915(e)(2)(B) and 1915A(b)(1), and thus that this inmate has incurred a "strike" under 28 U.S.C. §1915(g).

The court **DENIES AS MOOT** the plaintiff's motion to appoint counsel. Dkt. No. 3. The court **DENIES AS MOOT** the plaintiff's motion *in limine*. Dkt. No. 14.

**I FURTHER CERTIFY** that if the plaintiff appeals from this decision, he would not file that appeal in good faith pursuant to 28 U.S.C. §1915(a)(3), unless he offers *bona fide* arguments supporting his appeal.

Dated in Milwaukee, Wisconsin this 29th day of February, 2016.

BY THE COURT:

HON. PAMELA PEPPER
United States District Judge